FILED

**November 22, 2021**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0684 -    *Fairmont Tool, Inc. v. Adam J. Davis, Individually and on Behalf of Those Similarly Situated*

Jenkins, Chief Justice, dissenting:

In this case, the majority has concluded that an employer who gave its employees advances on their salaries, by allowing them to use the employer's accounts to voluntarily purchase various items and services for their personal use and convenience, violated the Wage Payment and Collection Act by not treating the advances as wage assignments. The majority has additionally concluded that the circuit court did not err in resolving the employer's breach of contract and unjust enrichment counterclaims by granting summary judgment to the employees on those issues. Because I believe the majority has improperly overruled this Court's precedent in finding that the salary advances were wage assignments, and wrongly upheld the circuit court's award of summary judgment as to the employer's claims for breach of contract and unjust enrichment, I respectfully dissent.

1

Fairmont Tool, the defendant employer in this class action, engaged in several practices to give its employees some monetary help.[1]  For example, Fairmont Tool provided the class representative, Mr. Davis, with a company credit card to be used for items related to the maintenance of the Fairmont Tool truck he drove in performing his job duties.  According to Mr. Davis's deposition testimony, he understood that, although the credit card bore his name, it was to be used for maintaining the truck and his charges on the card would be paid by Fairmont Tool.  Nevertheless, Fairmont Tool allowed Mr. Davis to occasionally use the card for personal items.  Mr. Davis admittedly used the card to purchase personal items, such as a CB radio antenna and CB mic for his personal vehicle,[2] lunch for himself, and a meal for his family.  He also purchased a winter coat for his personal use on a Fairmont Tool account, and a bag of calcium chloride.[3]  Fairmont Tool

---

[1] It is unclear from the record how long Fairmont Tool engaged in this practice or how much money it advanced to its employees; however, the circuit court found that, during the five-year period between July 1, 2012, and July 31, 2017, which is the period identified in the class definition, Fairmont Tool deducted $87,731 as reimbursements for money so advanced.  In granting summary judgment to the plaintiffs, the circuit court assessed liquidated damages in the amount of $237,997, which, when added to the amount deducted from employee pay during the five-year period, resulted in a total damages award of $325,728.

[2] When asked why he used the company credit card to purchase the CB equipment rather than paying for it himself, Mr. Davis responded that he "did not have enough money at the time."  He also testified that, when he asked for permission to use the company credit card to make the personal purchase, he was told that the amount would be taken from his next check.  When asked if he agreed to that, he responded "Yes."

[3] Presumably this was a bag of calcium chloride crystals such as is typically used to melt snow and ice.  *See, e.g., Pringle v. F. Health*, No. 2008-T-0131, 2013 WL

2

allowed the advanced funds to be repaid over time, by withholding amounts due from its employees' pay,[4] rather than requiring repayment in a lump sum, and Fairmont Tool charged no interest on the money advanced.

Fairmont Tool also gave its employees an annual $120 allowance for the purchase of necessary safety boots. According to Mr. Davis's testimony, Fairmont Tool provided him a $120 voucher that would be honored at a local store.[5] Fairmont Tool also had an account at this store and received a 10% discount on purchases. On more than one occasion, Mr. Davis chose to purchase safety boots that cost more than the $120 voucher, and he purchased them on Fairmont Tool's account and received the accompanying 10% discount. He also used Fairmont Tool's account, and received Fairmont Tool's discount, to purchase winter boots for himself and a pair of boots for his son's personal use. All of these purchases were made with the understanding that he would repay Fairmont Tool for

---

608560, at *1 (Ohio Ct. App. Feb. 19, 2013) (referring to "a de-icing agent . . . called calcium chloride").

[4] According to the majority opinion, "it appears the company deducted about $10.75 from each employee's wages every month." *Maj. Op.* at 26, n.19.

[5] There was evidence presented below that, as an alternative to using a voucher, employees could pay for their safety boots out-of-pocket and then submit their purchase receipt to Fairmont Tool to receive reimbursement up to $120.

the amounts advanced for his personal purchases.[6]  Again, Fairmont Tool allowed the

advanced funds to be repaid over time by withholding amounts due from employee pay,[7]

and charged no interest on the sums advanced.

Finally, although Fairmont Tool provided, free of charge, fire retardant

uniforms to its employees to wear while at client well pads, employees could also

voluntarily choose to obtain a rental uniform through a third-party vendor, which included

laundry services.[8]  Fairmont Tool paid the bulk of the expense of the uniform

rental/cleaning service, with employees who voluntarily chose to use the optional service

contributing $9 per week toward its cost.

This Court has previously distinguished the repayment of salary advances

from wage assignments.  The facts presented in this case are comparable to a case where

---

[6] In providing deposition testimony about his purchase of boots that exceeded the amount of the annual $120 allowance provided by Fairmont Tool, Mr. Davis was asked "What was your understanding of what was going to happen with the amount that was more than $120?" He responded, "the remainder of the balance would be taken out of my check." With respect to the boots he purchased for his son, he answered affirmatively when asked "So, you had every intent of paying for those, correct? . . . I mean, when you bought them, you knew you were going to have to pay for them?"

[7] *See supra* note 4.

[8] This uniform rental and cleaning service was initiated by a Fairmont Tool employee who is now a member of the class certified in this action.

we found payments to be salary advances rather than improper wage assignments. *See Rotruck v. Smith*, No. 14-1284, 2016 WL 547190 (W. Va. Feb. 10, 2016) (memorandum decision). In *Rotruck*, the employee was provided with financial assistance from her employer, Insurance Queen, in the form of "filling her car with gas, paying for some of her medication, making her car payment on two occasions[,] and advancing her cash to cover emergencies." *Id.* at *3, n.12. In analyzing whether the advances were wage assignments, the *Rotruck* Court looked to the decision in *Clendenin Lumber & Supply Co., Inc. v. Carpenter*, 172 W. Va. 375, 305 S.E.2d 332 (1983). At the time *Clendenin Lumber* was decided, the Wage Payment and Collection Act ("WCPA") did not define the term "assignment of earnings" as therein used. Consequently, the definition for that term was gleaned from the Consumer Credit and Protection Act ("CCPA"), which, at the time, provided

> "Assignment of earnings" includes all forms of assignments, deductions, transfers, or sales of earnings *to another*, either as payment or as security, and whether stated to be revocable or nonrevocable, and includes any deductions authorized under the provisions of section three [§ 21-5-3], article five, chapter twenty-one of this Code, except deductions for union or club dues, pension plans, payroll savings plans, charities, stock purchase plans and hospitalization and medical insurance.

W. Va. Code § 46A-2-116(2)(b) (eff. 1974) (emphasis added). The *Clendenin Lumber* Court addressed whether "to another" as used in the foregoing definition was intended to include an employer. The Court found that "to another" did include an employer, but only

5

when the employer was also a creditor of the employee: "The phrase 'to another' as used in the definition of an assignment of earnings under *W. Va. Code*, 46A-2-116(2)(b) [(1974)], includes an employer *when that employer is also the creditor of the employee.*" Syl. pt. 1, *id.* (emphasis added).[9] Although West Virginia Code section 46A-2-116 was amended in 1996, before *Rotruck* was decided, the above quoted language of paragraph (b) was not substantively changed.[10]

Applying the *Clendenin Lumber* holding, the Court in *Rotruck*, a 5-0 decision, concluded that,

> unlike the employer in *Clendenin Lumber* who engaged in the sale of commercial products to its own employees in consumer credit transactions, Insurance Queen was not a creditor of Ms. Rotruck. . . .
>
> Rather than being consumer credit transactions or consumer loans, the advances to Ms. Rotruck by Insurance Queen appear to be more akin to salary advances graciously provided in response to Ms. Rotruck's financial need. Under

---

[9] Factually, Clendenin Lumber was engaged in the retail and wholesale marketing of lumber and hardware products. It had a policy of extending credit to its employees to allow them to purchase its goods. The credit extended by Clendenin Lumber to its employees bore an interest rate of 1.5% per month (or 18% annually) after the first thirty days. *See Clendenin Lumber & Supply Co. v. Carpenter*, 172 W. Va. 375, 376-77, 305 S.E.2d 332, 334 (1983). Thus, this was a retail arrangement rather than a salary advance.

[10] The only difference between the 1974 and 1996 versions of West Virginia Code section 46A-2-116(b) is that the word "Code" is capitalized in the 1974 version, and lower-case letters are used in the 1996 version. *Compare* W. Va. Code § 46A-2-116(b) (eff. 1974) *with* W. Va. Code § 46A-2-116(b) (eff. 1996).

6

these circumstances, the circuit court correctly concluded that the advances by Ms. Rotruck's employer, Insurance Queen, were not wage assignments.

*Rotruck*, 2016 WL 547190, at *5. Notably, after *Rotruck*, the Legislature revised the WPCA to expressly adopt the definition of "assignment of earnings" as set out in the CCPA, which is the definition interpreted in *Clendenin Lumber* and applied in *Rotruck*. *See* W. Va. Code § 21-5-1(o) (eff. 2021) ("The term 'assignment', as used in §21-5-3 of this code, shall have the same meaning as the term 'assignment of earnings' set forth in §46A-2-116(2)(b) of this code."). The Legislature also revised section 46A-2-116(2)(b), but, significantly, did not alter the language "to another":

> "Assignment of earnings" includes all forms of assignments, deductions, transfers, or sales of earnings *to another*, either as payment or as security, and whether stated to be revocable or nonrevocable, and includes any deductions authorized under the provisions of § 21-5-3 of this code, except deductions for union, labor organization, or club dues or fees, pension plans, payroll savings plans, charities, stock purchase plans, and any form of insurance offered by an employer.

W. Va. Code § 46A-2-116(2)(b) (eff. 2021). By retaining the unaltered language "to another" after that language had been interpreted and applied by this Court, the Legislature signaled its approval of the interpretation:

> "[I]t is a recognized principle that where a statute has been interpreted by the courts, the continued use of the same language by the Legislature subsequent to the judicial interpretation is indicative that the legislative intent has been correctly ascertained (*Matter of Curtin v. City of New York*, 287 N.Y. 338, 342, 39 N.E.2d 903; *Matter of Gilmore v.*

7

> *Preferred Acc. Ins. Co.*, 283 N.Y. 92, 97, 27 N.E.2d 515;
> *Transit Commn. v. Long Is. R.R. Co.*, 253 N.Y. 345, 354-355,
> 171 N.E. 565)."

*Visitation of Cathy L.(R.)M. v. Mark Brent R.*, 217 W. Va. 319, 325, 617 S.E.2d 866, 872 (2005) (quoting *Knight-Ridder Broadcasting, Inc. v. Greenberg*, 511 N.E.2d 1116, 1119 (N.Y. 1987)).  *See also State v. Hosea*, 199 W. Va. 62, 68 n.15, 483 S.E.2d 62, 68 n.15 (1996) ("W. Va. Code 49-5-8 was modified in 1994, but the modified provisions are not relevant to this case.  Since we assume that elected representatives know the law at the time of any amendment to a statute, it is logical to assume that the Legislature was fully aware of the *Ellsworth J.R.* opinion, and agreed with its interpretation.").

Thus, we may assume that the Legislature has endorsed this Court's interpretation of the term "assignment of earnings" as referring to an employer only when the employer is also a creditor of the employee.  Similarly, we may assume that the Legislature agrees with this Court's related conclusion that a salary advance by an employer who is not a creditor of the employee is not an assignment of wages.  For this reason, I believe the majority incorrectly overruled *Rotruck*.  Instead, *Rotruck* should have been applied to the facts of this case.  Fairmont Tool was not in the business of selling CB equipment, boots, coats, food, or work clothing.  Thus, it was not a creditor to its employees for their purchases of these items.  Instead, Fairmont Tool granted salary advances to allow its employees to obtain these items, which often allowed them to take advantage of

8

Fairmont Tool's company discount. Fairmont Tool permitted its employees to repay the advances over time, without interest, through salary withholdings amounting to approximately $10.75 per month.[11] Applying *Rotruck* to these facts, it is clear that these advances were not an assignment of wages.

The majority further has upheld the circuit court's award of summary judgment in favor of the employees as to Fairmont Tool's breach of contract and unjust enrichment counterclaims. By doing so, the majority has concluded that, despite being hit with a total judgment of $512,246.14,[12] Fairmont Tool is entitled to no offset for the value of the items and services voluntarily purchased by its employees through salary advances, when the employees obtained such advances with the understanding that they would repay the funds advanced to them by Fairmont Tool.

In granting summary judgment to the employees, the circuit court interpreted Fairmont Tool's breach of contract counterclaim as asserting that the employees breached agreements "that permitted [Fairmont Tool] to withhold wages from their paychecks in order to pay for certain goods and services." This is a mischaracterization of Fairmont

---

[11] *See supra* note 4.

[12] The employees were awarded $325,728 in damages, $160,000 in attorney's fees, $21,518.14 for litigation costs, and $5,000 for a class representative service fee.

Tool's counterclaim. Fairmont Tool actually alleged that the employees "entered into a contractual relationship under which . . . each of them *agreed to reimburse Fairmont Tool*" for a portion of or all of the costs of the benefits they voluntarily requested. (Emphasis added). Thus, Fairmont tool did not allege a contract specifying the mode of repayment, but simply that there would be repayment. Therefore, this agreement does not violate the WPCA, as interpreted by the circuit court and the majority,[13] and should not have been deemed illegal as violative of the WPCA. Fairmont Tools has argued that, by seeking to avoid repayment, in any form, Mr. Davis and the other employee class members have anticipatorily breached their agreement with Fairmont Tool to repay salary advances they were given to purchase personal items and services.

> The general rule in cases of anticipatory breach of contract is that where one party repudiates the contract and refuses longer to be bound by it, the injured party has an election to pursue any of three remedies: he may treat the contract as rescinded and recover on quantum meruit so far as he has performed; or he may keep the contract alive for the benefit of both parties, being at all times ready and able to perform, and at the end of the time specified in the contract for performance, sue and recover under the contract; or he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized, if he had not been prevented from performing.

Syl. pt. 1, *Annon v. Lucas*, 155 W. Va. 368, 185 S.E.2d 343 (1971). Furthermore, allowing the employees to reap the benefits of the items and services they purchased through salary

---

[13] As explained above, I disagree with the majority's conclusion that Fairmont Tool's actions violated the WPCA.

advances, without reimbursing Fairmont Tool, unjustly enriches the employees. *See Realmark Devs., Inc. v. Ranson*, 214 W. Va. 161, 164, 588 S.E.2d 150, 153 (2003) ("'[I]f benefits have been received and retained under such circumstance that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving the benefits to pay their reasonable value.'" (quoting *Realmark Devs. Inc. v. Ranson*, 208 W. Va. 717, 721-22, 542 S.E.2d 880 884-85 (2000)). Accordingly, I believe that Fairmont Tool should be allowed to advance these counterclaims and the circuit court erred in granted summary judgment to the employees thereon. I would reverse the circuit court's summary judgment order and remand for further consideration of those claims.

For the reasons explained above, I dissent. I am authorized to state that Justice Armstead joins me in this dissenting opinion.